UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

PAUL REED                                     CIVIL ACTION NO. 6:20-CV-1354

VERSUS                                        JUDGE ROBERT R. SUMMERHAYS

UNITED STATES OF AMERICA              MAGISTRATE JUDGE DAVID J. AYO

REASONS FOR JUDGMENT

This is an action brought under the Federal Tort Claims Act ("FTCA") against the United

States of America for personal injuries allegedly suffered by Plaintiff Paul Reed in an automobile

accident involving a federal employee, Amanda Campbell. The Court took the matter under

advisement following a bench trial. After considering the trial record, the arguments of counsel,

and the relevant authorities, the Court now makes the following findings of fact and conclusions

of law.

I.
THE TRIAL RECORD AND THE COURT'S FINDINGS OF FACT

A. Stipulations Between the Parties.

The parties made the following stipulations prior to trial.[1] A motor vehicle collision

occurred on August 14, 2017 between two vehicles in the parking lot of an apartment complex

located at 206 William Circle in Opelousas, Louisiana ("the collision"). One vehicle was being

operated by Amanda Campbell, and the other was being operated by Donald Berry. At the time of

the collision, Campbell was employed by the United States Postal Service ("USPS") as a mail

carrier, was working in the course and scope of that employment, and was operating a USPS long-

life vehicle ("LLV") to deliver mail. Reed was a passenger in the vehicle being operated by Berry.

Reed does not assert a claim for lost wages or loss of future earnings.

---

[1] ECF No. 32.

## B. Testimony Regarding How the Collision Occurred and Fault.

The parties agree that on August 14, 2017, an LLV operated by Campbell collided with a sedan operated by Berry in the parking lot of an apartment complex. Reed alleges that, as Berry was backing his automobile into a parking spot, Campbell was backing the LLV toward the exit of the parking lot. The vehicles' paths intersected, and Campbell backed the LLV into the front passenger door of Berry's automobile. Reed was sitting in the front passenger seat of the automobile, where the LLV made contact. Berry's automobile incurred approximately $600 in property damage, consisting only of damage to the front passenger door, which needed to be replaced. Photos of Berry's automobile from shortly after the collision show one small dent and one large deformation in the front passenger door. Trial Exhibit ("Tr. Exh.") J2 at 7.

### 1. Debra Bourgeois

Reed was a resident of the apartment complex where the collision occurred. Debra Bourgeois lived in the apartment below Reed's and witnessed the collision. On the day of the accident, Bourgeois was waiting for Campbell to arrive to deliver mail to the complex's centralized mailboxes. Bourgeois wanted to speak to Campbell about spiders Bourgeois had seen breeding under the mailboxes.

Bourgeois testified that Campbell arrived and delivered the mail, and the two had a "curt" conversation while Campbell placed the mail into the boxes. The mailboxes are adjacent to the parking lot, and once Campbell entered the parking lot, she drove straight through the lot and stopped the LLV near the mailboxes, rather than parking in a parking spot. Once Campbell had completed her mail deliveries, she got back into the LLV and reversed to leave the parking lot. Bourgeois testified that Campbell was facing forward while backing the LLV and accelerated

slightly. Bourgeois saw that Campbell was in danger of colliding with Berry's vehicle and attempted to warn Campbell, to no avail. Bourgeois witnessed the two vehicles collide.

## 2. Donald Berry

Berry testified that as he turned his automobile from the access road into the parking lot, he noticed that Campbell was standing outside the LLV and not looking toward Berry's vehicle. Immediately after Berry entered the parking lot, he turned his automobile to his left so that he could reverse into a parking spot on his right. Berry turned to face the rear of the automobile so that he could safely back into the spot and was not facing the LLV. At roughly the same time that Berry began to back the automobile into the parking spot, Campbell got into the LLV and began to reverse out of the parking lot.[2] Berry heard increased engine noise from the LLV, looked in the direction of the noise, and saw the LLV approaching. Berry activated his vehicle's horn to try to warn Campbell, and then the vehicles collided. Berry testified that the LLV struck the front passenger door of his automobile, which was unable to be opened and needed to be replaced. Berry's property damage was approximately $600. The sedan's airbags did not deploy, and the LLV sustained no visible damage.

## 3. Paul Reed

Reed echoed Berry's testimony regarding how the collision occurred. Reed was sitting in the front passenger seat of Berry's automobile. As the automobile entered the parking lot, Campbell was standing outside the LLV. As Berry turned the automobile to the left and began to back into a parking spot, Campbell got into the LLV and began to back out of the parking lot. When Berry began backing his automobile into the spot, the LLV was parked approximately fifty

---

[2] Given Berry's testimony that he was facing the rear of his vehicle, this appears to be speculation based on how events unfolded.

(50) feet away from Berry's vehicle.[3] Reed did not see the LLV begin to reverse, but heard sudden engine noise immediately prior to the collision, causing him to infer that the LLV had been accelerating. Bourgeois yelled to alert Campbell to the danger of a collision. Reed testified that after the collision, Campbell apologized and admitted she had been distracted and was trying to leave the complex quickly because she had had an argument with Bourgeois.

Campbell did not testify. An USPS accident report admitted into evidence indicated that Campbell "began to back up and did not see the driver of the other vehicle behind her until she had hit it" and "[t]he bumper of the LLV struck the right front and rear passenger door" of Berry's automobile. Tr. Exh. J4.

Based on the record, the Court finds the following facts with respect to the collision:

(1) Campbell entered the parking lot and drove the LLV straight through the lot, not turning, until the vehicle was adjacent to the mailboxes.

(2) While Campbell was depositing mail and/or speaking with Bourgeois, Berry's automobile entered the parking lot, turned to the left, and began to reverse into a parking spot.

(3) While Berry was executing these maneuvers, Campbell entered the LLV and began to reverse straight out of the parking lot. Berry and Bourgeois attempted to warn Campbell about the presence of the sedan.

(4) The rear bumper of the LLV collided with the passenger side of Berry's automobile, causing mild to moderate damage valued at approximately $600.

(5) Berry had time to use his car horn to warn Campbell but did not make any evasive maneuvers to avoid the collision.

---

[3] Berry and Reed testified that the distance from Berry's automobile to the LLV was approximately the length of the courtroom, which is approximately fifty feet.

(6) Reed was a passenger in Berry's automobile and was sitting on the side of the vehicle that was involved in the collision.

## C. **Reed's Injuries and Condition Prior to the Collision.**

Reed testified that he had multiple injuries prior to the collision for which he had been treated, and chronic pain for which he was being treated at the time of the 2017 accident. In approximately February of 2004, Reed was in a vehicle that was rear-ended by a tractor-trailer. Reed suffered injuries to his neck, back, and right knee. Treatment for these injuries included surgery on Reed's lower back and right knee, injections in his neck, and physical therapy or chiropractic therapy. Reed was treated by Dr. George Williams, among others, and the treatments ameliorated his symptoms.

After Reed underwent neck and back surgery in 2004, he applied for social security disability assistance on the grounds that chronic neck pain rendered him unable to work. The application was denied.

In approximately June of 2012, Reed was involved in another motor vehicle accident. He suffered whiplash in his neck and a flaring of the back pain from the previous accident. Reed rated this pain severity at seven to eight out of ten. Reed was treated with chiropractic therapy, which made his symptoms manageable.

In 2013, Reed appealed the denial of his 2004 social security disability application. Reed asserted that severe neck and back pain, including stiffness and radiating pain, precluded him from working or performing activities of daily life.

In approximately January of 2016, Reed was involved in a third motor vehicle accident. As with the 2012 accident, Reed experienced whiplash in his neck and pain in his back. Reed rated his pain severity at an eight out of ten. He was again treated with chiropractic therapy, which made

his symptoms manageable. The chiropractor opined, however, that Reed would suffer long-term symptoms due to the January 2016 collision.

Starting in 2016, Reed's primary care physician, Dr. Derek Metoyer, began prescribing Reed daily opioid medication to treat his chronic neck and back pains. Reed was complying with this regimen when the collision occurred.

In 2017, shortly before the collision, Reed again applied for social security disability assistance. This application was prompted by a sudden onset of pain in Reed's stomach while he was driving that lasted several hours. Reed believed the pain might have indicated a hernia. When he sought medical care for the pain, the provider advised him to stop driving altogether due to the risk of future episodes. Reed's 2017 disability application sought assistance on the grounds of stomach pain, neck pain, and back pain that rendered him unable to work.

### D. **Evidence on Damages, Medical Treatment, and Expenses.**

#### 1. **Paul Reed**

Reed testified at trial that he did not lose consciousness in the collision and declined to take an offered ambulance to a nearby emergency department. Reed went to the emergency department himself but left after several hours without being seen. The day after the collision, Reed felt stiff and had sharp pains in his right arm and right hip, some of which were present prior to the collision.

Generally, Reed testified that the neck symptoms and back symptoms that were present prior to the collision got worse afterward. Specifically, his neck would become stiff, and he experienced pain radiating from his neck down his right arm and from his hip down his right leg. Reed also experienced weakness in his right leg, which was not present prior to the collision.

Reed did not seek treatment for approximately two weeks after the accident because he was waiting for his counsel to arrange evaluations. Reed first saw Dr. Williams, the orthopedic surgeon who performed Reed's 2005 knee surgery and his 2007 back surgery.

Over the next approximately eighteen months, Reed underwent treatment with numerous providers, including Dr. Williams, Dr. Metoyer, and Dr. Michael Haydel. These three physicians treated Reed both before and after the collision, and had evaluated his neck and back beforehand. Reed's treating physicians first recommended physical therapy and/or chiropractic therapy, which provided some relief. When those treatments did not resolve the symptoms, they recommended injections in Reed's neck and back. These also provided some, but not total, relief. Due to the lack of total resolution, Reed's physicians recommended a cervical fusion, which further reduced his neck pain. To address Reed's continued lower back pain, Dr. Williams recommended implantation of a spinal cord stimulator. The stimulator reduced Reed's lower back pain, but did not address the weakness in his right leg. To address the leg weakness, Dr. Williams recommended injections in his right sacroiliac hip joint. When injections did not resolve the weakness, Dr. Williams recommended and performed a hip joint fusion. Reed testified that the hip fusion resolved his leg weakness. Despite all treatments, however, Reed testified that his pain symptoms remain more severe than they were prior to the collision.

As to general damages, Reed testified that he is distraught that the injuries, pains, and treatments he attributes to the collision have cost him time with his children.

### 1. Dr. Williams

Dr. Williams testified by deposition as one of Reed's treating physicians. Dr. Williams treated Reed from approximately 2004 to 2007 after Reed's 2004 injury, including performing neck injections and lower back surgery. Tr. Exh. J7 at 10-13, 29, 32-33.

Reed next saw Dr. Williams on August 31, 2017 after the subject collision. *Id.* at 9, 32-33.
Reed complained of pain in his neck and back, as well as pain radiating down his right arm and
both legs, and exhibited decreased range of motion. *Id.* at 9-10. Dr. Williams ordered magnetic
resonance imaging (MRI) of Reed's neck and low back in September of 2017, and testified that
those images showed "disc protrusion at C4-5 and foraminal narrowing at 5-6" in Reed's neck,
and "disc protrusion or disc bulge at L3-4 [and] L4-5" in his low back. *Id.* at 16-17. Dr. Williams
recommended that Reed increase his physical activity to lessen his pain symptoms. *Id.* at 15-16.
Dr. Williams opined that Reed's complaints and worsening pain in his neck and back were more
likely than not caused by the collision. *Id.* at 11-12. He further opined that Reed's prior injuries
made him more prone to suffer acute injury in the subject collision. *Id.* at 13.

After the MRI, Dr. Williams ordered discograms on Reed's neck and low back to get
additional information about potential pain-causing injuries. After reviewing the discogram
results, Dr. Williams concluded that Reed required a spinal fusion in his neck, specifically at levels
C4-5 and C5-6, but not in his low back. *Id.* at 18-19, 24. Dr. Williams related the need for this
fusion to the subject collision in light of Reed's complaints of neck pain, and did not believe that
Reed was a candidate for a cervical fusion prior to the collision. *Id.* at 19. Dr. Williams testified
that Reed is likely to need additional adjacent fusion surgeries in the future, including with
associated evaluations, medications, procedures, both before and after those future surgeries. *Id.*
at 19-22.

While Dr. Williams initially did not believe that the subject collision had created a need
for further lumbar surgery, Reed's continued complaints of low back pain prompted Dr. Williams
to recommend that Reed see Dr. Haydel, a pain management specialist, to evaluate whether a
spinal cord stimulator might be appropriate. *Id.* at 25-26. Dr. Haydel performed additional

discograms in January of 2019, and thereafter installed the stimulator. *Id.* at 26. Dr. Williams testified that, prior to the accident, Reed was not a candidate for a spinal stimulator because his pain was being adequately managed with medication. *Id.* at 28.

Dr. Williams testified that Reed continued to complain about pain and weakness in his right hip and leg after the spinal stimulator was installed, which prompted further investigation. *Id.* at 28-29. Dr. Williams determined Reed's right hip joint was likely the source of pain and recommended treatment. *Id.* That evaluation and treatment culminated in Dr. Williams recommending and performing injections and a hip fusion, which Reed testified largely resolved his leg pain and weakness. *Id.* Dr. Williams related this hip fusion also to the subject collision, given the chronology of treatment and complaints. *Id.*

Dr. Williams acknowledged that Reed was having issues related to his neck and back prior to the subject collision, and that Reed's post-collision imaging did not suggest that Reed had "suffered from a traumatic or acute event." *Id.* at 24, 33-34. Dr. Williams was unaware that Reed was injured in collisions in 2012 or 2016, and of what treatments Reed received for them. *Id.* at 34-37. Dr. Williams was also unaware of Reed's applications for social security disability prior to the collision. *Id.* at 37-38.

## 2. Dr. Metoyer

Dr. Metoyer, a family physician, testified by deposition as one of Reed's treating physicians. Reed began seeing Dr. Metoyer in March of 2016. Tr. Exh. J6 at 9-10. In March and October of 2016, Reed complained to Dr. Metoyer of chronic back pain, as well as neck pain and pain radiating down his arms and legs. *Id.* at 10-12. Reed informed Dr. Metoyer about his 2005 right knee surgery and 2007 lumbar surgery but had no major complaints regarding his knee or elbows in 2016. *Id.* at 11-12. Dr. Metoyer prescribed Reed daily opiate pain medication for his

chronic neck and back pain, which was still in place at the time of the subject collision. *Id.* at 27-34. Dr. Metoyer was unaware that Reed was injured in collisions in 2012 or 2016, and of what treatments Reed received for them. *Id.* at 40-42. Dr. Metoyer was also unaware of Reed's applications for social security disability. *Id.* at 42.

Reed sought evaluation by Dr. Metoyer on September 11, 2017 due to the subject collision. *Id.* at 13. At that point, Reed complained of pain in his neck, low back, shoulders, elbows, hips, and knees. *Id.* at 14-15. He also complained of radiating pain, similar to his 2016 complaints. *Id.* at 14-15, 32. Reed exhibited limited range of motion in his neck, back, and shoulders. *Id.* at 14. Dr. Metoyer prescribed anti-inflammatory medication, continued opiate medication to address pain, and physical therapy, noting that Dr. Williams had already scheduled imaging studies of Reed's spine. *Id.* at 17-18. Dr. Metoyer later increased the prescribed medication regimen after Reed's reported pain increased. *Id.* at 18. As of Dr. Metoyer's deposition, Reed was still prescribed daily pain, inflammatory, and muscle relaxing mediation, and Dr. Metoyer saw no indication that Reed did not comply with the treatments prescribed. *Id.* at 34.

Dr. Metoyer was aware of Dr. Williams' treatments and recommendations, as they were treating Reed simultaneously, though Dr. Williams did not consult with Dr. Metoyer about surgical treatments. *Id.* at 18-19. Prior to the collision, no physician sought Dr. Metoyer's clearance to perform a spinal fusion or hip fusion, or to install a spinal cord stimulator, as would be standard practice. *Id.* at 21-23.

Dr. Metoyer acknowledged that over the course of approximately six years of care since 2016, Reed's complaints had remained consistent, even through his neck fusion, hip fusion, and spinal stimulator surgeries, and Dr. Metoyer's recommended treatments for Reed's pain had not changed. *Id.* Dr. Metoyer noted on July 26, 2021 that Reed had likely reached maximum medical

improvement absent further surgical treatment, but would likely suffer from aggravated symptoms for the rest of his life. *Id.* at 24-25.

Dr. Metoyer opined that Reed's prior injuries more likely than not made him more prone to being injured in a subsequent collision. *Id.* at 17. Dr. Metoyer also opined that Reed's complaints of pain in September 2017 were more likely than not caused by the collision, as were the exacerbation of his prior neck, back, radicular pain, leg, and elbow symptoms. *Id.* at 14-16. Dr. Metoyer testified that all of the treatments that are relevant here were done to address Reed's injuries arising from the collision, and none of them were unreasonable.

### 3. Dr. Haydel

Dr. Haydel, an interventional pain specialist, testified by deposition as one of Reed's treating physicians. Reed was referred to Dr. Haydel by Dr. Williams for evaluation of Reed's lumbar symptoms via discogram. Tr. Exh. J8 at 9, 16. Reed first saw Dr. Haydel on December 19, 2018. *Id.* at 9. At that time, Dr. Haydel was aware that Reed suffered from chronic low back pain. *Id.* at 11. The notes Dr. Haydel reviewed of the September 2017 MRI report indicated "mild L3-4 and 4-5 annular bulging and L5-S1 post-surgical changes as a result of an anterior fusion." *Id.* at 10-11. Dr. Haydel's examination focused on Reed's lower extremities, and his neurological reflexes "were symmetrical and normal." *Id.* at 16-17. Dr. Haydel performed the discogram recommended by Dr. Williams. *Id.* at 17-18. While the discogram did not reveal a physical basis for Reed's symptoms in the L3-4 or L4-5 areas, Reed continued to complain of low back pain. *Id.* at 17-21.

In April of 2019, Dr. Williams again referred Reed to Dr. Haydel, this time for an evaluation of whether a spinal cord stimulator would address Reed's low back and leg symptoms. *Id.* at 22. Dr. Haydel determined that Reed was a candidate for a spinal stimulator trial. *Id.* at 22-

23. Because the trial was successful, Dr. Haydel recommended and performed an installation of a
spinal cord stimulator implant. *Id.* at 24-25. Such an implant requires its battery to be changed
every five to seven years, and each change requires a separate surgical procedure. *Id.* at 26-27.

Dr. Haydel agreed with Drs. Williams and Metoyer that Reed's prior injuries and chronic
pain made him more susceptible to suffer injury in a subsequent collision, and that he will require
treatment into the future arising from the 2017 accident. *Id.* at 11-15, 31-32. Dr. Haydel also agreed
that Reed's complaints after the 2017 collision—including aggravation of symptoms—were more
likely than not caused by the collision, and thus that all treatments for which Reed seeks
compensation were related to the collision. *Id.* at 11-15. Dr. Haydel acknowledged that Reed had
been suffering from chronic lumbar pain prior to the subject collision. *Id.* at 33-35. Dr. Haydel was
unaware that Reed was injured in collisions in 2012 or 2016, and of what treatments Reed received
for them. *Id.* at 37-38. Dr. Haydel was also unaware of Reed's applications for social security
disability. *Id.* at 38-39.

### 4. Dr. Romero

Dr. Neil Romero, an orthopedic spine surgeon, testified live at trial. Dr. Romero conducted
an independent medical examination of Reed on December 31, 2021, on behalf of the government.
In short, after examining Reed and reviewing the records he was provided, Dr. Romero concluded
that the vast majority of Reed's pain symptoms were not related to the subject collision, except for
Reed's subjective complaints of aggravated pain which resolved with physical therapy. Therefore,
with the exception of appropriate therapy provided at Opelousas General Hospital, Dr. Romero
opined that none of the treatments for which Reed seeks compensation were necessitated by the
collision.

Specifically, Dr. Romero pointed to the fact that Reed complained of neck and back pain consistently before and after the collision, at a severity that did not change. Reed was undergoing treatment for that pain with Dr. Metoyer at the time of the collision. This persuaded Dr. Romero that Reed's symptoms were caused by chronic conditions and injuries from prior collisions rather than the subject accident. Dr. Romero further opined that the images of Reed's spine taken after the subject collision did not show any objective indication of injury that would cause the type of symptoms of which Reed complained, and did not show significant change from 2012 images. Therefore, Dr. Romero concluded that the only injury or complaint caused by the collision was a subjective aggravation of Reed's neck and back pain, which was ameliorated with physical therapy. While Reed alleged that his hip pain first arose after the accident and was resolved by the hip fusion, and that the spinal cord stimulator provided substantial relief, Dr. Romero testified that those complaints first arose more than two years after the collision, so could not be tied to the collision by a preponderance of the evidence.

Dr. Romero testified that his opinion was bolstered by the fact that Reed acknowledged he had not worked since May of 2017 due to excessive neck and back pain. Reed also received steady pain management through medication since 2016, with little or no change in symptoms before or after the collision, suggesting that the collision had only a temporary and subjective aggravating effect. In essence, Dr. Romero testified that most of the treatments Reed received after the accident were equally justified prior to the subject collision, and other treatments were for conditions that arose too long after the collision to be definitively related to it.

## II.
### CONCLUSIONS OF LAW

Reed's claims are brought pursuant to the FTCA, 28 U.S.C. §§ 2671-80, which "provides broadly that the United States will accept liability for common torts committed by its agents to the same extent and in the same manner as liability would attach to a private individual in similar circumstances." *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 374 (5th Cir. 1987). Jurisdiction is granted by 28 U.S.C. § 1346(b)(1). The substantive law of Louisiana applies to the claims brought in this suit. *Cleveland ex rel. Cleveland v. U.S.*, 457 F.3d 397, 403 (5th Cir. 2006); *see also* 28 U.S.C. § 1346(b)(1).

"Louisiana Civil Code Article 2315(A) provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The duty-risk analysis assists in the determination as to "fault" and requires the establishment of the following elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) whether the plaintiff was damaged (the damages element)." *Cobb v. Delta Exports, Inc.*, 2005-509 (La. App. 3 Cir. 12/30/05), 918 So. 2d 1080, 1088, *writ denied*, 2006-0225 (La. 4/24/06), 926 So. 2d 551 (internal citations omitted). "In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more

probable than not." *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So. 2d 564, 578 (internal citations omitted).

More than one party may be at fault for the damages sustained in a motor vehicle accident, which is reflected in Louisiana's comparative negligence scheme. *Fontenot v. Patterson Ins.*, 2009–0669 (La.10/20/09), 23 So.3d 259, 267 (citing La. Civ. Code art. 2323). In deciding which parties are responsible, a duty-risk analysis is used in which the plaintiff must prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendants owed a duty to the plaintiff, which the defendants breached; and (3) the risk of harm was within the scope of protection afforded by the duty breached. *Id.* The allocation of fault between comparatively negligent parties is a finding of fact. *Sims v. State Farm Auto. Ins. Co.*, 98–1613 (La.3/2/99), 731 So.2d 197, 199. In apportioning fault, the fact finder shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Gibson v. State Through Dept. of Transp. and Development*, 95–1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, *writs denied*, 96–1862, 96–1895, 96–1902 (La.10/25/96), 681 So.2d 373–74 (citing *Campbell v. Louisiana Dept. of Transp. and Development*, 94–1052 (La.1/17/95), 648 So.2d 898, 902). In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned by the fact finder, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought..." *Schexnayder v. Bridges*, 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985)).

A motorist has a duty to use reasonable care in operating a vehicle. *Sinitiere v. Lavergne*, 391 So. 2d 821, 826 (La. 1980). This includes the duty to "maintain a careful lookout, observe any obstructions present, and exercise care to avoid them." *Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So. 2d 1002, 1015 (citing *Sinitiere*, 391 So. 2d at 826). A motorist does not have a duty to observe every possible hazard, but "to see that which a reasonably prudent observer would have seen under similar circumstances." *Fontenot v. Patterson Ins.,* 2009–0669 (La.10/20/09), 23 So.3d 259, 270 (citing *Fernandez v. General Motors Corp.*, 491 So. 2d 633, 636 (La.1986)). "If a motorist fails to see what he should have seen, the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen." *Id.* (quoting *Fernandez*, 491 So. 2d at 636-37). "A driver has a duty to drive defensively from the time the driver witnesses negligent operation of another vehicle or notices other hazards posing the potential for resulting damage," and this obligation "may include the duty to slow down or otherwise avoid risks posed" by other vehicles. *Edwards v. Horstman*, 96-1403 (La. 2/25/97), 687 So. 2d 1007, 1011.

The government argues that La. Stat. Ann. § 32:281(A)—part of the Louisiana Highway Regulatory Act—imposes a duty on reversing drivers, which Berry violated. However, it is not clear that that statute applies in the context of a parking lot. For example, in *Collins v. Creighton*, Louisiana's Second Circuit found that "the reasonably expected speed and movement of vehicles in a parking lot and the utility of closely configuring the parking spaces" impose a lower duty on drivers in a parking lot than the duty on drivers on a highway, and applied the general duty-risk analysis to determine fault in a parking lot collision. 53,522 (La. App. 2 Cir. 9/23/20), 303 So. 3d 1114, 1121 (quoting *Lawrence v. Groan*, 42,842 (La. App. 2 Cir. 1/9/08), 973 So. 2d 959, 962). The jurisprudence of Louisiana's Third Circuit similarly holds that the Highway Regulatory Act

is not controlling in a parking lot, and "a motorist traveling in a parking lot is required to exercise a duty of 'due caution.'" *Duhon v. State Farm Mut. Auto. Ins. Co.*, 2012-41 (La. App. 3 Cir. 5/2/12), 94 So. 3d 113, 116 (quoting *Chenevert v. Wal–Mart Stores, Inc.*, 02–1075, p. 4 (La.App. 3 Cir. 2/5/03), 838 So.2d 922, 924). On the other hand, in *Turner v. New Orleans Pub. Serv. Inc.*, the Louisiana Supreme Court cited section 32:281(A) for the proposition that "[b]acking a truck without knowing whether it can safely be done is grossly negligent" in a case involving a truck backing into a pedestrian inside a warehouse. 476 So. 2d 800, 802 (La. 1985). Whether the applicable duty arises under section 32:281(A) or the general duties of a motorist, however, both Berry and Campbell were backing their vehicles when the collision occurred, so they were subject to the same duties. Accordingly, fault must be apportioned between Campbell and Berry.

In a personal injury suit, a plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident that caused the injury. *Maranto v. Goodyear Tire & Rubber Co.*, 650 So.2d 757, 759 (La. 1995). Under Louisiana law, "[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." *Id.* at 761 (quoting *Housley v. Cerise*, 579 So.2d 973 (La. 1991); *see also Fair v. Allen*, 669 F.3d 601, 605 (5th Cir. 2012)). "A tortfeasor is required to pay for the medical treatment of the victim, and even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith." *Ezzell v. Miranne*, 84 So.3d 641, 654 (La. 5 Cir. 2011); *see also Vines v. Wood*, 785 So.2d 126, 131 (La. 2d Cir. 2001); *Antippas v. Nola Hotel Group, LLC*, 265 So.3d 1212, 1218 (La. App. 4 Cir. 2019); *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010).

Nevertheless, "[a]n injured party has a duty to take reasonable steps to mitigate his damages. *Aisole v. Dean,* 574 So.2d 1248 (La.1991); *Britt v. City of Shreveport,* 45,513 (La.App.2d Cir.11/03/10), 55 So.3d 76; *Fletcher v. Simmons,* 37,758 (La.App.2d Cir.10/29/03), 859 So.2d 292." *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1256.

Under Louisiana law, a tortfeasor must take the injured person as he finds him. The tortfeasor is responsible for all the natural and probable consequences of his wrong, even though they are more serious or harmful by reason of a pre-existing condition or weakness of the injured person. If the accident results in aggravation of a previous condition of disability or of pain of the injured person, the tortfeasor is liable both for the aggravation of the pre-existing condition and for any new injuries resulting from the accident. However, a plaintiff must prove by a preponderance of the evidence (1) the prior existing condition, and (2) the extent of the aggravation. 18 La. Civ. L. Treatise, Civil Jury Instructions § 18:10 (3d ed.); *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005-06 (La. 1993).

Louisiana law permits awards for future medical expenses, but they "must be established with some degree of certainty." *Duncan v. Kansas City Southern Railway Co.*, 773 So.2d 670, 685 (La. 2000). "The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary." *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010).

General damages, which cannot be "fixed with pecuniary exactitude" take into account mental and/or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of lifestyle which cannot be definitely measured in monetary terms, both in the past and to be anticipated in the future. *Duncan*, 773 So.2d at 682. "Vast discretion is accorded the trier of fact in fixing general damage awards." *Id.* at 682. "The factors

to be considered in assessing quantum of damages for pain and suffering are severity and duration. More specifically, the nature, relative severity, and extent of bodily injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiff's injury symptoms and the duration of treatment are quantitative factors that must also be taken into account." *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1252 (citing *LeBlanc v. Stevenson*, 00–0157 (La.10/17/00), 770 So.2d 766; *Thongsavanh v. Schexnayder*, 09–1462 (La.App. 1st Cir.05/07/10), 40 So.3d 989, *writ denied*, 10–1295 (La.09/24/10), 45 So.3d 1074)).

## III.
### APPLICATION OF FACTUAL FINDINGS TO THE LAW

#### A. Liability and Allocation of Fault.

The record does not include evidence that Reed contributed to the collision or any injury resulting therefrom. Accordingly, Reed was not at fault for the August 2017 collision. The actions of Berry and Campbell each contributed to the collision, and fault must be apportioned between them.

The record reflects that the parking lot where the collision occurred was largely empty at the time. Campbell's LLV entered the parking lot, drove forward, and stopped adjacent to the centralized mailboxes. While Campbell was standing outside the LLV delivering mail, Berry entered the parking lot, almost immediately turned to the left, and began backing into his intended parking spot. During this backing maneuver, and while Berry's automobile was perpendicular to the LLV, the LLV reversed into the passenger side of Berry's vehicle. This undisputed series of events suggests two likely scenarios. One is that Berry's automobile was either stopped or traveling extremely slowly, such that while Berry was backing up, Campbell had time to enter the LLV, prepare to reverse, and travel approximately fifty feet at a speed appropriate to the circumstances,

all without noticing Berry's automobile. In this scenario, Berry would have had ample time to notice the LLV's approach and avoid the collision, or at least to attempt to avoid it. The other possibility is that Campbell reversed with such speed that avoiding the collision was rendered difficult or impossible for Berry.

Neither possibility is foreclosed by the evidence in the record, but the latter is more consistent with the trial testimony. Bourgeois testified that Campbell reversed under slight acceleration, but did not characterize the LLV's speed as inappropriate for a parking lot. Berry testified that he heard the LLV's engine noise, then saw the reversing LLV and engaged his car horn. Reed testified that he heard engine noise from the LLV and then saw it shortly before the impact. Campbell admitted that she was distracted, suggesting that she did not properly use her mirrors to look behind her as she was backing out of the lot. However, there was no testimony regarding whether Berry had time to avoid the LLV once he knew it was backing up. While Berry had a continuing duty to drive defensively once he observed the danger, the trial testimony does not prove that he failed to do so.

A review of similar cases is instructive on the appropriate apportionment of fault. *Miller v. State Farm Mut. Auto Ins. Co.* involved a collision between two reversing vehicles in a parking lot. 2005-1032 (La. App. 3 Cir. 3/1/06), 923 So. 2d 886. In that case, the plaintiff testified that her vehicle was parked in a spot between two other vehicles which partially blocked her lateral views. *Id.* at 888. The plaintiff backed partly out of the spot to get a clear view of oncoming traffic in the adjacent lane of travel,[4] saw the defendant's vehicle coming, and stopped to let it pass. *Id.* The defendant saw available parking spots opposite the plaintiff's vehicle and passed them so that he

---

[4] The term "lane of convenience" is used for convenience. In this case, as in many involving a collision in a parking lot, there were no clear markings separating lanes of travel as there would be on a highway. Nonetheless, drivers in such cases tend by convention to travel on the right-hand side of the portions of the lot available for travel.

could back into one of them, and did not see that the plaintiff's vehicle was attempting to leave. *Id.* After the defendant's vehicle passed, the plaintiff continued backing out of the spot, at the same time that the defendant began backing into one of the open spots. *Id.* Neither driver saw the other vehicle backing up before t heir vehicles collided. *Id.* The trial court held that each driver was fifty percent responsible for the collision, and the circuit court did not disturb that finding. *Id.*

In *McDonald v. Hollingsworth*, the parties' vehicles were each parked in a parking spot on opposite sides of a two-lane street, roughly across from one another. 02-131 (La. App. 5 Cir. 6/26/02), 823 So. 2d 408. The defendant backed her vehicle across the lane of travel adjacent to her parking spot and into the far lane—i.e., the lane adjacent to the plaintiff's parking spot. *Id.* at 409-10. The plaintiff checked for oncoming traffic in the lane of travel adjacent to his parking spot, saw none, and then backed into that lane. *Id.* The defendant's vehicle backed into the same lane, against the flow of traffic and from the direction the plaintiff had not checked, and collided with the plaintiff's vehicle. *Id.* The trial court dismissed the plaintiff's negligence claims, finding insufficient evidence that the defendant had breached a duty. *Id.* Louisiana's Fifth Circuit disagreed and apportioned seventy percent of the fault to the defendant, holding that she had the greater obligation of care because she was attempting to reverse across two lanes of a street that went in opposite directions. *Id.* at 411.

In *Simon v. United States*, a USPS LLV backed into the plaintiff's stationary automobile in a parking lot, traveling at approximately three miles per hour at the time of the collision. 51 F. Supp. 2d 739, 741 (W.D. La. 1999). At the time of the collision, the plaintiff was waiting to turn onto the adjacent street but was operating the automobile on the wrong side of the road. *Id.* at 745. The LLV incurred no visible damage, and the automobile suffered "a barely distinguishable dent in the left front door." *Id.* at 741-42. The court apportioned fifty percent of the fault to each driver,

holding in part that the fact that the plaintiff's automobile was on the wrong side of the road meant that it was reasonable for the reversing USPS driver not to expect the automobile to be there. In addition, given the low speed involved, the plaintiff "could easily have avoided the accident" and "should have had ample opportunity to blow her horn or move her vehicle." *Id.* at 748.

In *Duhon v. State Farm*, the plaintiff's vehicle was traveling through an intersection in a parking lot at approximately one mile per hour. *Duhon*, 94 So. 3d at 115-16. The defendant's vehicle entered the lot from an adjacent street, entered the intersection where the plaintiff's vehicle was, and the vehicles collided. Both vehicles were damaged—the plaintiff's on the ride side, and the defendant's on the left front—in a manner which suggested the defendant's vehicle collided with the plaintiff's. Louisiana's Third Circuit held that both drivers acted negligently and each was fifty percent at fault. *Id.* at 117.

In *Chenevert v. Wal-Mart Stores, Inc.*, the plaintiff was traveling through a parking lot and collided with a forklift driven by the defendant's employee. 2002-1075 (La. App. 3 Cir. 2/5/03), 838 So. 2d 922, 924-25. The area where the collision happened was one where boxes of merchandise were stored, which obstructed the plaintiff's view. *Id.* There was testimony that the forklift emerged unexpectedly from behind the boxes, but also that the plaintiff was traveling with excessive speed. *Id.* There, the jury apportioned fifty percent of fault to each driver, and that finding was not disturbed. *Id.*

In *Lawrence*, the defendant slowly backed her vehicle out of a parking spot into a parking lot's lane of travel. 973 So. 2d at 960. The defendant's view while parked had been blocked by adjacent vehicles, requiring that she back out slightly to see whether there was oncoming traffic. *Id.* The plaintiff was driving in the lane of travel into which the defendant was backing, and the plaintiff's vehicle collided with the defendant's. *Id.* The damage to each vehicle indicated clearly

that the plaintiff's vehicle hit the defendant's vehicle after the latter had protruded into the plaintiff's lane of travel. *Id.* at 963. The trial court held that the defendant had not breached any duty, and Louisiana's Second Circuit affirmed, holding that if the plaintiff had been driving slowly and attentively, he would have been able to recognize the defendant's vehicle emerging into his lane of travel and avoided a collision. *Id.*

Berry and Reed suggest that there was insufficient time to avoid the collision, though Berry had time to use his automobile's horn after spotting Campbell's LLV backing toward his vehicle. Moreover, the damage to Berry's vehicle, although relatively minor, was more than a "barely distinguishable dent," indicating the LLV here was traveling more quickly than the one in *Simon*. Finally, Campbell admitted to the other parties involved that she was distracted and did not notice Berry's automobile. On the other hand, to the extent lanes of travel exist in the parking lot, Berry put his vehicle in the oncoming lane of travel when he knew there were other vehicles in the lot at the same time.[5]

"In assessing the nature of the conduct of the parties, the Court has considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought." *Schexnayder v. Bridges*, 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985)).

---

[5] A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. La. Stat. Ann. § 32:79.

Considering the trial record and the relevant authorities, the Court concludes that Campbell bears more responsibility than Berry, though both contributed to the collision. Like the defendant in *McDonald*, Campbell was attempting to perform a long-distance reversing maneuver, placing her vehicle in a space that was available to other vehicles using the same parking lot, which imposed a higher duty on her to see potential hazards. Like the plaintiff in *Simon*, Berry placed his vehicle in a lane of travel that would typically be used by vehicles traveling in the opposite direction. In most of the cases discussed above, neither driver here saw the other's vehicle prior to the collision, and each was assessed fifty percent of the fault. The facts of this case are most similar to *McDonald*, and it is appropriate to apportion fault similarly. The Court finds that Campbell was seventy percent **(70%)** at fault, and Berry thirty percent **(30%)**. As Berry is not a party to this matter, any damages to which Reed is entitled from the government will be reduced accordingly.

## B. Medical Causation.

Reed's medical treatments and expenses fall into four categories: neck (cervical) pain or injury, lower back (lumbar) pain or injury, hip pain or injury, and aggravation of preexisting pain or injury.

### 1. Cervical and Lumbar Pain.

As to Reed's cervical and lumbar pain, Reed has not carried his burden of proving that they were caused by the subject collision. The Court considered the following:

- Reed was involved in a severe accident in 2004 with a tractor-trailer that resulted in neck, back, and knee injuries, which ultimately resulted in lumbar surgery.

- Reed was involved in a second accident in 2012 that resulted in severe neck and back pain. Reed did not report improvement in that pain over eleven months of treatment.

- Reed was involved in a third accident in 2016 where, again, he suffered neck and back injuries.

- Reed's treating physicians and Dr. Romero all agreed that Reed had suffered substantial injuries in prior accidents and had chronic pain in his neck and low back that was being treated with medication at the time the collision happened.

- Before the subject 2017 accident, Reed applied for Social Security disability assistance, asserting that his neck and back pain rendered him unable to work.

- Reed testified at trial that his condition was largely the same before and after the accident, but that afterward the pain in his neck and low back were more severe.

- Dr. Romero testified that the pain Reed reported after the subject 2017 accident was caused by chronic conditions predating the collision, and that the images of Reed's spine taken after the 2017 accident did not show significant changes from images taken after the 2012 accident.

- The Court finds Dr. Romero's testimony credible. The Court places less weight on the testimony of Drs. Haydel, Metoyer, and Williams with respect to causation because they were unaware of Reed's 2012 and 2016 collisions.

Accordingly, Reed has not established by a preponderance of the evidence that the subject accident caused his neck and back pains.

## 2. Aggravation of Cervical and Lumbar Pain.

As to aggravation, there is no dispute between Reed, his treating physicians, or Dr. Romero that his symptoms worsened after the collision. Reed testified at trial that his doctors first recommended physical therapy, home exercises, and the use of crutches. Reed testified that these treatments provided substantial relief of his neck and lumbar symptoms, but not total relief. Again, however, the record shows that Reed had been complaining of neck and lumbar symptoms prior to the collision, so the lack of total resolution does not show that the collision caused the neck and lumbar symptoms. Dr. Romero also offered unrebutted testimony that Reed reported that after the accident, he experienced substantial amelioration of symptoms after undergoing physical therapy at Opelousas General Hospital. In light of that report, and the fact that Reed complained of roughly equivalent neck and lumbar pain before and after the collision, Dr. Romero testified that the evidence was consistent with the 2017 collision having caused Reed to experience an aggravation

of neck and lumbar symptoms that was ameliorated with physical therapy.[6] Accordingly, Reed has
carried his burden of proving that the collision caused aggravation of his neck and lumbar pain
that was addressed with physical therapy.

### 3. Hip Injury.

Reed has carried his burden of proving that his hip injury was caused by the subject
collision. Contrary to Dr. Romero's testimony that Reed first complained of hip pain
approximately two years after the collision, Dr. Metoyer testified that Reed reported hip pain at
his first visit after the collision, in September 2017. Tr. Exh. J6 at 14-15. Reed offered unrebutted
testimony at trial that after the collision, he experienced weakness in his right leg for the first time,
which resolved after Dr. Williams performed the hip joint fusion surgery.

Furthermore, Dr. Romero's IME report and Dr. Aaron Wolfson's life care plan corroborate
Dr. Williams' testimony regarding the chronology of Reed's hip treatment, as follows: Reed's
spinal cord stimulator was installed on July 22, 2019. J35 at 21. On December 5, 2019, Reed
reported to Dr. Williams that he continued to have hip pain, though his lumbar pain had lessened
with use of the stimulator. *Id.* After an evaluation, Dr. Williams determined the right hip joint was
a possible source of pain and recommended a right hip injection, which he performed on January
20, 2020. *Id.* On February 19, 2020, Reed reported that the injection had provided temporary relief,
and Dr. Williams' certified physician assistant recommended a second injection, which Dr.

---

[6] Reed argues that this opinion was not included in Dr. Romero's expert report. However, the Assessment
section of Dr. Romero's report of December 31, 2021 states, in part,

> While [Reed] may report a subjective increase in his underlying symptoms, I do not relate
> his need for extensive treatment, which has included injections and multiple surgical
> procedures, to the motor vehicle collision from August 14, 2017. I do believe that the initial
> physical therapy that was performed which was documented in the medical records to have
> provided him some relief would be appropriate for his subjective increase in symptoms.

(J34 at 6).

Williams performed on March 9, 2020. *Id.* On April 6, 2020, Reed reported temporary and less relief from the second injection, discussed treatment options with a provider in Dr. Williams' office, and indicated a preference for a hip joint fusion. *Id.* On May 29, 2020, Dr. Williams performed a right hip joint fusion. *Id.* On June 6, 2020, Reed reported minimal pain in his hip, and Dr. Williams recommended physical therapy. J34 at 3; J35 at 21. On March 23, 2021, Reed reported some residual pain in the right hip, and Dr. Williams recommended continued therapy. *Id.* On July 22, 2021, Dr. Williams noted that Reed's right leg was noticeably stronger and recommended that Reed continue with home exercises and only return if needed. *Id.*

This undisputed timeline shows by a preponderance of the evidence that the collision caused injury to Reed's right hip that was ameliorated through injections, surgery, and therapy. While Reed testified that he had experienced pain radiating into his hips after a prior collision, the government did not offer testimony or records suggesting that Reed experienced pain originating in his right hip prior to the collision. The government did not rebut Reed's testimony that he experienced right leg weakness for the first time after the collision. Accordingly, Reed has carried his burden of proof as to his hip injury.

## IV.
### DAMAGES AWARDED

#### A. Damages.

Reed is entitled to damages arising from the injuries or aggravations he suffered in the 2017 accident. As noted above, Reed has proved by a preponderance of the evidence that the collision caused (1) his hip injury and (2) aggravation of his neck and lumbar pains.

#### 1. Past and Future Medical Expenses.

Reed seeks $555,770.00 in past medical expenses and $1,422,715.00 in future medical damages. Reed is entitled to the medical expenses incurred in three categories: (1) the initial

evaluations and imaging studies performed as a result of the collision, (2) physical therapy to
address the aggravation of Reed's lumbar and cervical pain, and (3) treatments to address Reed's
hip injury and symptoms. Reed did not offer evidence or testimony that those categories will
require future treatments. Accordingly, Reed is entitled to certain past medical expenses and no
future medical expenses.

Based on Reed's itemization of medical expenses, P1, the Court awards the following
amounts:

1) $5,311.00 for Reed's initial evaluations with Dr. Williams, Dr. Metoyer, and Sunset
   Imaging, from August 31, 2017 through September 21, 2017;

2) $5,955.00 for Reed's physical therapy at Opelousas General Hospital from October 11,
   2017 through January 25, 2018; and

3) $88,951.90 for evaluations, injections, surgery, and physical therapy related to Reed's hip
   treatment.[7]

Reed's past medical expenses total $100,217.90. In light of the apportionment of fault, Reed is
entitled to recover special damages in the amount of **$70,152.53** from the government.

## 2. General Damages.

Reed seeks a total of $4,500,000 for past and future general damages.[8] The government
argues that Reed is entitled to no more than $15,000 in general damages. As noted above, Reed is
entitled to damages arising from the aggravation of his neck and lumbar pains, which Reed told
Dr. Romero resolved on approximately January 25, 2018, and his hip injury, which he told Dr.

---

[7] These are the amounts in Reed's treatment itemization that are distinguishable as being related to the hip
only. The record shows that, through implantation of the spinal cord stimulator, Reed's low back treatments
were intended to address his lumbar, hip, and lower extremity symptoms.

[8] Specifically, Reed requests $300,000 for past and future mental and emotional pain and suffering,
$4,000,000 for past and future physical pain and suffering, and $200,000 for past and future loss of
enjoyment of life

Williams resolved on approximately June 9, 2020. As to general damages, Reed testified that he

lost substantial time with his children due to his pain and treatments. Reed testified that he used

crutches for a time as directed by his physicians. However, Debra Bourgeois testified that she

never saw Reed using a cane, brace, or medical device, or have trouble navigating the stairs to his

apartment, and saw him walking around the complex almost daily until she left the complex in

January of 2018.

Reed cites several cases to support his general damages claim, but most are inapposite

because they did not involve similar injuries or treatments to the ones for which Reed can recover.[9]

One of the relevant cases he cites is *O'Neal v. USA*, No. 19-CV-1472, 2022 WL 468966 (W.D. La.

Feb. 15, 2022), *reconsidered in part on other grounds*, No. 19-CV-1472, 2022 WL 2288057 (W.D.

La. June 24, 2022)(Drell, J.). *O'Neal* involved a two-vehicle collision on a two-lane highway, in

which the defendant's USPS LLV turned left and collided with the plaintiff's vehicle, which was

attempting to pass the LLV on the left in a "no passing" zone. *Id.* at *1. The plaintiff's physicians

recommended that he undergo bilateral cervical ablations every twelve to eighteen months for

approximately ten years, at which point they would no longer be effective and he would require a

fusion. *Id.* at *4. However, by the time of trial three years after the collision, the 58-year-old

plaintiff had had one ablation on one side of his neck, and was still able to work as a singer and

announcer, though he could not lift heavy objects. *Id.* Assuming the plaintiff would have the

surgery in the future after a series of approximately twelve injections, and the possibility that

surgery might diminish the plaintiff's quality of life, the court awarded $260,000 in past and future

general damages. *Id.* at *8. Ignoring the other factual distinctions, here, Reed had only two

---

[9] Counter to Reed's assertion, in *Vick v. Ford*, 721 So.2d 535 (La. App. 3 Cir. 1998), which involved
intensive medical treatment, the court recounted that the plaintiff was awarded damages of $3,239,028, but
did not indicate how much of the award was special versus general damages.

injections and had hip surgery approximately three years after the collision. Furthermore, Reed testified that surgery largely resolved his leg symptoms, and did not indicate ongoing problems with his right leg that were not present before.

Reed also cites *O'Key v. United States*, No. 2:20-CV-00119, 2022 WL 1813952, at *1 (W.D. La. June 2, 2022)(Cain, J.). There, while a USPS LLV was stopped to deliver mail, the plaintiffs' vehicle passed the LLV on the left and turned right, a few meters ahead of the LLV, to enter their driveway. *Id.* at *1-2. While the plaintiffs' vehicle was turning, the LLV began driving forward and collided with the plaintiffs' right front wheel. *Id.* The plaintiff driver began experiencing neck, shoulder, and back pain immediately after the collision, and underwent more than three years of treatment involving physical therapy, medication, and injections. *Id.* at *4-6. The court found that the plaintiff would require future medical treatment, including therapy and at least one surgery. *Id.* at *16. The court also noted that the plaintiff complained of pain consistently starting after the accident, and continued to work in an occupation that exacerbated her injuries. *Id.* Considering all the factors, the court awarded $200,000 in past and future general damages. *Id.* Here, Reed attempted to treat his hip injury, along with his chronic and aggravated injuries, for approximately three years prior to surgery. Again, Reed testified that surgery largely resolved his leg symptoms, and did not indicate ongoing right leg pain that was not present before.

The government cites several cases in support of its position.[10] In *Jones v. Bravata*, 280 So.3d 226 (La. App. 1 Cir. 5/29/2019), the plaintiffs' vehicle was rear-ended by the defendant's vehicle. One of the plaintiffs began to experience various pains a few hours after the collision, including in her neck and back, and underwent numerous treatments over the next several years, including non-invasive surgical procedures. *Id.* at 230-31. There was conflicting testimony about

---

[10] In the government's cited cases that are not discussed, either the plaintiff was held to not have been injured or the defendant was held not to be liable for negligence. Neither is the case here.

the effectiveness of the treatments. *Id.* at 234-35. The jury awarded that plaintiff a total of $15,000 in past and future general damages. *Id.* Louisiana's First Circuit declined to disturb that award because there was evidence that: the plaintiff exaggerated the severity and duration of her symptoms; the collision caused her neck injury and aggravated her prior back injury; and her neck pain was inconsistent and less severe than her back complaints. *Id.* at 237. Here, there was not testimony that Reed exaggerated the severity or duration of his symptoms, and all physicians agreed his neck and back pains were aggravated.

In *McMaster v. Progressive Sec. Ins. Co.* 152 So.3d 979 (La. App.4 Cir. 10/29/14), the plaintiff's vehicle was rear-ended by the defendant driver. The plaintiff underwent orthopedic treatment for over a year, but did not require surgery until he was treated for a subsequent injury which required a cervical fusion. *Id.* at 981-82. Ten years prior to the subject accident, the plaintiff was in a vehicle collision and alleged in a suit that he experienced "severe" neck injuries causing "permanent disability." *Id.* at 981. The plaintiff continued to work after the third accident, including performing part-time manual labor after his cervical fusion. *Id.* at 981-82. The jury awarded $10,000 in past and future general damages, which Louisiana's Fourth Circuit declined to disturb in light of the plaintiff's pre-existing conditions, inconsistent work history, and impeached credibility. *Id.* at 983. While Reed had pre-existing conditions, there was no evidence of a subsequent collision and there was agreement both about Reed's aggravation and hip injury, including their successful treatments.

In *Kaiser v. Hardin*, 2006-2092 (La. 4/11/07), 953 So. 2d 802, the married plaintiffs sued for damages arising from a motor vehicle accident. Three months prior to the subject collision, the plaintiff wife had suffered a stroke, which resulted in her experiencing tingling in two of her fingers at the time of the subject collision. *Id.* at 805. The plaintiffs were also involved in two other vehicle

collisions, approximately two weeks prior and one week after the subject collision. *Id.* at 804. After
the subject collision, the plaintiff wife sought treatment for neck pain and left finger numbness. *Id.*
She underwent therapy, medication, and injections for two to three years thereafter, with no
decrease in symptoms, and the jury awarded the wife $13,200 in general damages. *Id.* at 805-08.
Louisiana's Fourth Circuit increased her general damages to $30,000, but the Louisiana Supreme
Court reinstated the jury's award, holding that there was evidence the plaintiff suffered pre-
existing spine degeneration, and no evidence that the second accident aggravated her condition
more than the other collisions. *Id.* at 809-10.

Other cases are instructive as well. In *Graves v. Ward*, No. CIV.A. 02-2914, 2002 WL
31556355, at *2 (E.D. La. Nov. 15, 2002), for instance, the court cited numerous cases supporting
a range of $3,500 to $35,000 for neck and back pain and aggravation arising from a motor vehicle
collision. In another example, *Tripp v. DG Louisiana, LLC*, 23-487 (La. App. 5 Cir. 4/24/24), 386
So. 3d 1197, 1206, *reh'g denied* (May 7, 2024), which involved a slip and fall rather than a vehicle
collision, the plaintiff required extensive treatments, including SI joint injections and fusion, and
experienced certain complications from treatment that required reparative treatment. The jury
awarded her $236,000 in general damages, and Louisiana's Fifth Circuit declined to disturb that
award. *Id.* at 1211-12. The court held that there was evidence that the plaintiff's condition had
improved after her treatments and surgeries, and there was little evidence that she continued to
experience pain and suffering, mental anguish, or emotional distress. *Id.* at 1211-12.

Here, Reed testified that he experienced aggravation of his neck and lumbar symptoms for
approximately six months, which resolved after physical therapy, and experienced pain and
weakness in his hip and leg for approximately three years, which resolved after surgery. While
those injuries and treatments no doubt created physical and emotional pain and suffering before

symptoms resolved, Reed did not offer evidence of how they were made manifest beyond having lost time with his children.

The extent of the subject accident, the aggravation of pre-existing injuries and pain symptoms, and the impact on Reed's daily activities and quality of life after the 2017 accident, as compared to prior to the accident, do not support a damages award similar to that in *O'Key* and *O'Neil*. However, in light of the aggravation of neck and back symptoms and the injury to and procedure performed on Reed's hip, the evidence does not support the lower awards in *Jones*, *McMaster*, and *Kaiser*. Considering the evidence in the record and the relevant cases, the Court finds Reed is entitled to $50,000 in general damages. Applying the apportionment of fault, Reed is entitled to recover **$35,000** in general damages from the government.

## B. Failure to Mitigate

In post-trial briefs, the government argues that Reed's past medical damages should be reduced to zero due to his bad faith failure to mitigate his damages. ECF Nos. 59 at 19; 60 at 7. A plaintiff has a duty to make reasonable efforts to mitigate the damage caused by a tortfeasor, and if the plaintiff fails to make such efforts, the tortfeasor may demand a reduction in damages. *MB Indus., LLC v. CNA Ins. Co.*, 2011-0303 (La. 10/25/11), 74 So. 3d 1173, 1181 (citations omitted). "The failure to mitigate damages is an affirmative defense, and the burden of proof is on the party asserting the defense." *Id.*

The government argues that before and after the accident, Reed was covered by Medicaid, which is government-provided health insurance that reimburses medical providers at a lower rate than they would receive from private insurers. ECF Nos. 59, 60. Some of the providers Reed treated with for the subject collision had also treated him previously and accepted Medicaid reimbursement at that time. *Id.* However, after the collision, Reed and several of his medical

providers executed a series of agreements with HMR Funding, LLC ("HMR Funding"), a third-party litigation funding company. ECF No. 41 at 1-2. Under these contracts, HMR Funding agreed to pay for Reed's medical services allegedly arising from the collision, at a discount of the amounts the providers invoiced to Reed. Reed assigned his rights to recover any amounts he received from this litigation, up to the invoiced amounts, to his medical providers, who then assigned those rights to HMR Funding. The agreements provide that Reed remains liable to the providers for the total undiscounted invoiced amounts. *Id.*

The government argues that, by entering the agreements with HMR Funding to pay for care, instead of continuing to use Medicaid for the "same exact care," Reed unnecessarily increased his special damages "exponentially." ECF No. 60 at 9. Additionally, the government asserts that Reed lied in the HMR Funding agreements when he asserted he could not afford his medical treatments. Reed argues that even during the existence of the HMR Funding agreements, he used Medicaid whenever possible, and that the government offers no evidence that Reed could have received the same treatments he did by using Medicaid rather than HMR Funding.

The Court finds the government has not carried its burden of showing Reed failed to mitigate his damages. No evidence was adduced at trial of which treatments prior to the subject collision had been covered by Medicaid, nor was there evidence of which of Reed's post-collision treatments would have been available to him under Medicaid and which would not. Thus the Court cannot determine the extent to which Reed might have increased his damages, or whether such increase was "exponential." And while the government cites cases that Reed's recovery can be reduced for his failure to mitigate, it does not provide authority for reducing his recovery to zero.

Furthermore, the Court is not persuaded that Reed lied in the HMR Funding agreements when he agreed that he was unable to pay the invoiced amounts. Indeed, the facts that Reed was

not working at the time of the collision due to his pain, and was covered by a program intended for the indigent and disabled, suggests that he did not have the ability to pay for his medical treatment himself, as stated in the agreements. The agreements did not require Reed to attest that he was without any ability to have medical services paid for by a third party, as the government's argument requires.

Finally, the government has not proven that Reed acted in bad faith. The government's own support defines bad faith as continuing treatment after having been healed for the sole purpose of increasing damages, or deliberate exaggeration of the impact of a collision and the extent of injuries. ECF No. 58 at 24. No evidence was offered at trial that Reed continued treatment after he had been healed or exaggerated the extent of his injuries for the sole purpose of increasing his damages. As discussed above, the undisputed record shows that Reed suffered a hip injury and aggravation of his neck and lumbar symptoms. Without evidence of what services were available to Reed using Medicaid versus a private payor, the government has not carried its burden that Reed failed to mitigate his damages.

## IV.
### CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that the government pay to Plaintiff, Paul Reed, **$70,152.53** in special damages and **$35,000.00** in general damages, for a total of **$105,152.53**, arising from the negligence of the government's employee, Amanda Campbell. Counsel for Plaintiff shall submit a proposed judgment, approved by counsel for the government, within fifteen (15) days of the date of this ruling. The judgment should award costs to Plaintiff, reduced commensurate with this Court's allocation of liability, and post-judgment interest to the plaintiff, as allowed by law.[11]

THUS DONE AND SIGNED this 5th day of March, 2025.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**

---

[11] Prejudgment interest is not available for claims brought under the Federal Tort Claims act. *See* 28 U.S.C. § 2674.